## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **RONNIE DARNALL MCKEITHEN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-CV-02389-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| ***Commissioner of Social Security***, | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER AND OPINION</u>[1]

Plaintiff, Ronnie Darnall McKeithen, ("Plaintiff"), brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entries dated Sept. 2, 2009].  Therefore, this Order constitutes a final Order of the Court.

AO 72A
(Rev.8/8
2)

("the Commissioner") denying his application for disability insurance benefits.[2]  For

the reasons stated below, the Court **REVERSES** the Commissioner's final decision.

## I.     PROCEDURAL HISTORY

Plaintiff initially filed an application for DIB on May 14, 2005, alleging

disability commencing on July 7, 2003, which he later amended as commencing on

January 31, 2006.  [Record (hereinafter "R") 43-45, 186].  Plaintiff's application was

denied initially and on reconsideration.  [R24-27, 29-32].  Plaintiff then requested a

hearing before an Administrative Law Judge ("ALJ").  [R23].  The hearing was held

on November 28, 2008.  [R178-21].  Following the hearing, ALJ Frederick Waitsman

issued an unfavorable decision on December 17, 2008.  [R10-19].  Plaintiff sought

---

[2]      Title II of the Social Security Act provides for federal disability insurance benefits (hereinafter "DIB").  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the disabled (hereinafter "SSI").  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  The relevant law and regulations governing the determination of disability under a claim for DIB are identical to those governing the determination under a claim for SSI.  *Davis v. Heckler*, 759 F. 2d 432, 435 n.1 (5th Cir. 1985).  Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.  In general the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  Different statutes and regulations, however, apply to each type of claim.  Plaintiff has only applied for DIB.  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claim.

2

review of the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on June 26, 2009, rendering the ALJ's decision the final decision of the Commissioner.  [R4-6].

Plaintiff then filed a civil action in this Court on August 21, 2009, seeking review of the Commissioner's final decision.  *Ronnie Darnall McKeithen, v. Michael J. Astrue,* Civil Action File No. 1:09-CV-02389-AJB.  [Doc. 2].  The answer and transcript were filed on December 28, 2009.  [Docs. 7-8].  Plaintiff filed his brief on January 28, 2010, [Doc. 11], and Defendant filed a response on March 1, 2010, [Doc. 12].  Plaintiff filed a reply brief on March 11.  [Doc. 13].  The undersigned held an oral argument hearing. [*See* Doc. 14].  The matter is now before the Court upon the administrative record and the parties' pleadings, briefs and oral argument, and is ripe for review pursuant to 42 U.S.C. § 405(g).

## II.     STATEMENT OF FACTS

### A.     Administrative Records

A May 9, 2005, Disability Report indicated that Plaintiff's right knee operation limited his ability to work because: (1) he could not bend his knee or lift over 20 pounds; and (2) his doctor limited him to light duty work, but his employer did not have such work for him.  [R51].  Plaintiff described his prior jobs as: (1) asphalt work

for a construction company between 1988 and 1992; (2) general maintenance of cars from 1995-1996; and (3) sewer repair work for a county government between 1997 and July 2003.  [R52].  Plaintiff completed the tenth grade in 1975 and was not enrolled in special education classes.  [R57].

In a March 2006 Disability Report – Appeal, Plaintiff reported that his pain had increased and that he could no longer stand for five minutes.  [R74].  Plaintiff reported having difficulty getting into and out of the bath tub, putting on his socks and shoes, and climbing stairs.  [R77].

Plaintiff reported taking the following medications: (1) Hydrocodone (an opiate analgesic for moderate or severe pain),[3] Tramadol (pain reliever for moderate to moderately severe pain), Propoxyphene (pain reliever for mild to moderate pain) for pain; (2) Zolpidem for high blood pressure; and (3) Lipitor and Vytorin for cholesterol. Plaintiff also stated that Dr. Raymond Hui prescribed a right knee brace for him while physical therapy provided him with a cane.  [R83].

_____

[3]    Unless otherwise stated in this opinion, all medical descriptions and definitions are from the MedLinePlus website, which is a website produced by the National Institutes of Health to provide the public with information about diseases, conditions, and medications.  *See* http://www.nlm.nih.gov/medlineplus/ (last visited 3/11/2011).

4

B.     *Medical Records*[4]

Dr. Raymond C. Hui started seeing Plaintiff in December of 2001.  [*See* R162].

On December 4, 2002, Dr. Hui saw Plaintiff because of pain and swelling in his right

knee. [R162].  An X-ray revealed mild evidence of tricompartmental degenerative joint

disease ("DJD")[5] in his right knee, and Dr. Hui recommended Supartz injections.[6]

[R163].  Plaintiff had a second injection on December 18, 2002, [R155], and a third

injection on January 3, 2003.  [R151].  Dr. Hui reported that Plaintiff experienced

minimal relief following the injections.  He diagnosed Plaintiff with moderate right

knee DJD and an osteochondral lesion (tear in the cartilage covering the bones in joint,

_____

[4]     The transcript contains medical records from the year 2000, [R84-92], but the Court will not summarize them given Plaintiff's amended disability onset date of January 31, 2006.

[5]     Degenerative joint disease, also known as osteoarthritis is the most common form of arthritis that causes pain, swelling and reduced motion in an individual's joints by breaking down cartilage in a person's joints.

[6]     Supartz and Orthovisc injections are used to relieve knee pain from osteoarthritis in which the substance serves as a knee joint lubricant.  The procedure provides effective short term treatment, but the improvements in pain and function are relatively small.  *See* ACPA Consumer Guide to Pain Medication and Treatments 2011 at 78, http://www.theacpa.org/uploads/ACPA_Consumer_Guide_2011%20final.pdf (last visited 3/10/2011).

5

leading to pain and swelling in th joint).[7]  [R151].  On February 3, 2003, Plaintiff reported obtaining excellent relief from the final injection, but that he then overused the knee at work.  Dr. Hui recommended that Plaintiff try two to three days of RICE therapy, a knee strengthening program, and only moderate level duty at work.  [R149]. Dr. Hui saw Plaintiff on March 7, 2003, and recommended that Plaintiff continue with light duty work.  [R147].

Plaintiff went to Dr. Hui on April 18, 2003, complaining of right knee pain and stiffness with episodes of locking.  Dr. Hui recommended an MRI after physical therapy, anti-inflammatories, and injections did not result in significant symptomatic improvement.  [R159].  Plaintiff returned to Dr. Hui on April 30, 2003, for a followup examination.  The medical note indicated that the MRI had shown a degenerative-type tear involving the posterior horn of the medial and lateral meniscus.  Dr. Hui found that Plaintiff had right knee DJD and a medial and lateral meniscal tear (tear in the C-shaped piece of cartilage in the knee).  Dr. Hui recommended arthroscopy repair.  [R160].

Plaintiff had his preoperative arthroscopy visit with Dr. Hui on July 26, 2003, at which time Dr. Hui diagnosed Plaintiff with OCD (osteochondral) lesion and right knee

---

[7]     *See* Cedars-Sinai, Osteochondral Lesions/Osteochondritis Dessicans, http://www.cedars-sinai.edu/Patients/Health-Conditions/Osteochondral-Lesions-Ost eochondritis-Dessicans.aspx (last visited 3/11/2010).

AO 72A
(Rev.8/8
2)

medial meniscal tear.  [R141].  On July 1, 2003, Dr. Hui performed a right knee diagnostic arthroscopy, a chondroplasty medial femoral condyle and patella, and debridement of the anterior horn of lateral meniscus (surgical removal of meniscus). [R144].  Following the surgery, Plaintiff was diagnosed with a right knee lateral meniscal tear, degenerative anterior horn, large osteochondral lesion, and chondromalacia patella (softening or breakdown of cartilage that lines the underside of the patella (knee cap)).  [R144].  Plaintiff reported doing well on July 10, 2003, following the surgery.  [R139].

On July 31, 2003, Plaintiff reported doing well and being asymptomatic following the surgery.  Plaintiff complained of mild weakness in the right knee region. Dr. Hui recommended that Plaintiff return to light duty work on a permanent basis with no repetitive kneeling, squatting, or lifting greater than 50 pounds.  Dr. Hui instructed Plaintiff to return as needed for a follow up.  [R137].

Plaintiff returned to Dr. Hui on February 20, 2004, complaining of increasing pain with effusion in the right knee (collection of fluid in the knee joint).  Dr. Hui determined that Plaintiff had right knee DJD and quadriceps atrophy.  Dr. Hui aspirated fluid from the knee and recommended continuing knee strengthening and return to

7

work permanently on a moderate duty level.  Plaintiff was instructed to return as needed.  [R134].

Dr. Hui saw Plaintiff on October 25, 2004, at which time Plaintiff complained of mild discomfort with stair climbing and intermittent stiffness.  Plaintiff was diagnosed with right knee osteochondritis dissecans lesion (loss of blood supply to an area of bone beneath a joint surface, causing pain and the bone to breakdown), and chondromalacia (softening of the cartilage of the kneecap, which is associated with dull pain around or under the kneecap, which worsens when climbing or descending or when the knee bears weight as it straightens).[8]  Dr. Hui prescribed Bextra (an anti-inflammatory), told Plaintiff to continue with his home program, and instructed Plaintiff to follow up as needed.  [R133].

Plaintiff went to Dr. Hui on May 16, 2005, complaining of intermittent right knee pain and intermittent buckling of the right knee.  An examination revealed: (1) evidence of quad atrophy; (2) mild medial joint line tenderness; (3) mildly positive Apley test

-------------------

[8]     The descriptions for chondromalacia and osteochondritis dessicans came from the National Institute of Arthritis and Musculoskeletal and Skin Diseases website. Questions and Answers about Knee Problems, http://www.niams.nih.gov/Health_Info /Knee_Problems/default.asp (last visited 3/11/2011).

8

and McMurray test localized to the medial joint line[9]; and (4) negative effusion, anterior drawer, posterior drawer, Lachman test, and pivot-shift test. An X-ray revealed mild DJD changes to the medial compartment. Plaintiff was diagnosed with right knee osteochondral lesion and moderate medial compartment gonarthrosis (degenerative disease of the joint). Dr. Hui reported that Plaintiff did not have pain at rest and that activities improved symptomatology though Plaintiff had buckling-type symptoms and pain with increased activity. Plaintiff was prescribed Celebrex (anti-inflammatory) to be taken as needed, and Dr. Hui told Plaintiff to return as needed. [R131].

Plaintiff went to Dr. Hui on July 25, 2005, for a refill of his pain medication and because of intermittent right knee pain with activities. Plaintiff had a mildly positive Apley test and McMurray test localized to the medial joint line. An X-ray showed mild medial compartment narrowing of the right knee but was otherwise unremarkable. Dr. Hui concluded that Plaintiff had right knee chondromalacia and osteochondritis dissecans lesion. Dr. Hui recommended that Plaintiff continue with his strengthening program and that he not repetitively lift more than 20 pounds. [R129].

_____

[9]     The McMurray test involves the patient lying on his back while the doctor holds the heel of the injured leg and places pressure to compress the knee while the leg is rotated in and out. Pain or a click indicates an inner meniscal tear. For the Apley's test, the doctor holds the patient's foot and rotates it while applying a downward force. Pain in the inner part of the joint may indicate an inner meniscal tear.

AO 72A
(Rev.8/8
2)

On September 23, 2005, Plaintiff went to Dr. Hui complaining of a large right knee effusion with pain.  Dr. Hui aspirated the right knee and instructed Plaintiff to return in four to six weeks.  [R128].  Plaintiff returned to Dr. Hui on November 4, 2005, complaining of intermittent right knee pain with effusion.  An examination revealed full active and passive range of motion ("ROM"), mild knee effusion, and mild medial and lateral joint line tenderness.  Dr. Hui diagnosed Plaintiff with right knee medial meniscal tear, chondromalacia medial femoral condyle.  Dr. Hui recommended continued strengthening for the right knee.  He prescribed Feldene (medication used to relieve pain, tenderness, swelling, and stiffness from osteoarthritis) and told Plaintiff that he could return to work on a moderate duty basis with no lifting greater than 50 pounds.  [R127].

Dr. Daniel Kingloff examined Plaintiff on December 5, 2005, following a work injury in which a co-worker shoved a bale of hay into Plaintiff's leg, resulting in knee problems.  Dr. Kingloff's exam revealed that Plaintiff was not in severe distress, but he had knee fluid and a valgus deformity (outward turning of knee to an abnormal degree).  According to Dr. Kingloff, Plaintiff's knee was moderately unstable medial lateral and his kneecap seemed high.  Plaintiff's right quadricep was one inch smaller.  The anterior drawer sign was "1+ positive."  An X-ray revealed that Plaintiff had lateral

degenerative changes.  Dr. Kingloff concluded that Plaintiff was getting increasing degenerative arthritis in his knee, which might make Plaintiff choose to have a knee joint replacement.  Dr. Kingloff believed that Plaintiff would be permanently prohibited from performing his regularly assigned duties even with a joint replacement.  [R93].

On December 20, 2005, non-examining doctor, Phillip Gertler, completed a Physical Residual Functional Capacity Assessment and determined that Plaintiff: (1) could occasionally lift 50 pounds and frequently lift 25 pounds; (2) could stand and/or walk for 6 hours in an 8-hour day; (3) could sit for 6 hours in an 8-hour day; (4) was unlimited in his ability to push and pull; (5) could occasionally climb ramp/stairs; (6) could never crawl or climb ladder/rope/scaffolds; and (7) could frequently balance, stoop, kneel, and crouch.  [R95-96].  Dr. Gertler determined that Plaintiff had no manipulative, visual, communication, or environmental limitations. [R97-98].  Finally, Dr. Gertler found that Plaintiff was only partially credible because the severity of his allegations of disability were disproportionate to the objective findings.  [R99].

Plaintiff returned to Dr. Hui on January 6, 2006, complaining of increased knee pain with effusion.  Dr. Hui noted that Plaintiff had full active and passive ROM, moderate knee effusion, and mild lateral joint line tenderness.  An X-ray showed

11

moderate tricompartmental DJD.   Dr. Hui diagnosed Plaintiff with right knee chondromalacia and DJD.  Dr. Hui placed Plaintiff in a supportive hinged knee brace, asked Plaintiff to return in 6 to 8 weeks, and recommended that Plaintiff avoid any squatting or heavy lifting at work.  [R126].

On February 10, 2006, Plaintiff complained of pain localized to the right knee region with mild effusion.  Plaintiff had mild knee effusion, full ROM, and mild pain with palpation of the medial and lateral joint lines.  An X-ray of the right knee showed mild to moderate tricompartmental DJD.  Dr. Hui recommended conservative therapy because Plaintiff was too young for a knee replacement.  Dr. Hui recommended a light duty job or, "[s]econdary to evidence of tricompartmental arthritis," a sedentary job that would be permanent in nature.  Dr. Hui prescribed Feldene and told Plaintiff to return as needed.  [R125].

On April 27, 2006, Dr. Joel Moorhead, a state non-examining doctor, completed a Physical Residual Functional Capacity Assessment and concluded that Plaintiff could: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for 6 hours in an 8-hour day; (4) sit for a total of 6 hours in an 8-hour day; (5) push and/or pull without limitations; (6) frequently balance and stoop; (7) occasionally kneel, crouch, crawl, and climb ramp/stairs; and (8) never climb

12

ladder/rope/scaffolds. [R103-04]. Dr. Moorhead concluded that Plaintiff had no visual, manipulative, communicative, or environmental limitations. [R105-06]. Dr. Moorhead found Plaintiff to be partially credible because the severity of his condition was not credible according to the objective findings. [R107]. Finally, Dr. Moorhead stated that Dr. Hui's opinion was not supported by the evidence because "[a]rthritis in one knee would not appear to prevent light work, considering age and absence of other significant co-morbidities." [R108].

On May 8, 2006, Plaintiff went to Dr. Hui complaining of increased right knee pain and increased left knee pain. The right knee had mild medial joint line tenderness with a positive Apley test and McMurray test localized to the medial joint line. The left knee had full ROM and mild complaints of pain localized to the medial joint line. An X-ray of the left knee was negative while the one of the right knee showed evidence of moderate right knee DJD. Dr. Hui's impression was bilateral knee pain with right knee DJD and rule out medial meniscal tear in the left knee. Dr. Hui sought an MRI of both knees, but in the interim, prescribed Celebrex and told Plaintiff to continue with his right knee program. [R124].

AO 72A
(Rev.8/8
2)

Dr. Hui saw Plaintiff on June 30, 2006, for an Orthovisc injection[10] to both knees following Plaintiff's diagnosis with bilateral knee chondromalacia, which was greater in the right knee. Both knees showed no evidence of effusion, but they had mild medial and lateral joint line tenderness. Plaintiff was to return in one week for his second injection. [R173].

On July 7, 2006, Dr. Hui noted that Plaintiff came for his second injection and was experiencing good improvement. Plaintiff had bilateral mild medial and lateral joint line tenderness in his knees and full ROM in both knees. Dr. Hui diagnosed Plaintiff with bilateral knee chondromalacia. After the injection, Dr. Hui directed Plaintiff to return in one week for his third injection. [R169].

When Plaintiff returned for his third injection on July 17, 2006, he was complaining of mild intermittent pain. Plaintiff's knees had bilateral mild medial and lateral joint tenderness. They had full ROM. Plaintiff was diagnosed with bilateral knee DJD. [R168].

Dr. Hui completed a Pain Questionnaire on August 25, 2006, which contained the following findings. First, Plaintiff had moderate/severe pain with activity. Second, Plaintiff was credible with regard to pain because of his right knee degenerative joint

---

[10]     *See* note 6 *supra*.

14

disease.  [R166].  Third, it was medically reasonable for Plaintiff to need to lie down for at least two hours in the daytime.  Fourth, Plaintiff needed to elevate his leg on a daily basis.  Fifth, Plaintiff was psychologically limited in his ability to work because of pain.  Finally, Plaintiff was not able to work an eight-hour day because of his pain.  [R167].

On October 24, 2006, Dr. Thomas Myers saw Plaintiff for a consultative examination.  [R110-16].  Plaintiff explained to Dr. Myers that he initially injured his knee on January 3, 2006, and re-injured it after returning to work when he had a mild fall with a twisting injury.  [R111, 112].  Plaintiff complained of pain in both knees and pain from standing on concrete floors.  Plaintiff reported that he did not feel that he could ever return to work in sewer repair and that he had overused his left knee, which had made it difficult for him to perform daily activities.  Dr. Meyers noted that Plaintiff was using a cane and described "giving way" symptoms in both knees.  [R111].  Plaintiff's pain was a 9 on the day of his visit to Dr. Meyers.  [R112].  Plaintiff indicated that the knee pain limited his activities completely.  His knee was locking and catching in the four weeks prior to his visit.  [R112].

An exam of Plaintiff's right knee demonstrated obvious valgus alignment.  Plaintiff's squat was normal.  Plaintiff had quadriceps atrophy and effusion on the right.

15

AO 72A
(Rev.8/8
2)

He had mild medial aspect joint line tenderness and mild lateral aspect joint line tenderness. A passive patellar tilt demonstrated a lateral tilt. His Q-angle at 90 degrees was abnormal. There was moderate lateral facet tenderness. He had patellar grind. [R113].

An exam of Plaintiff's left knee revealed proximal, middle, and distal MCL tenderness. He had mild medial aspect and lateral aspect joint tenderness. He had moderate lateral facet tenderness and mild peripatellar pain. His hamstring strength was 5/5. Plaintiff's gait was bilaterally antalgic. [R113]. Dr. Myers diagnosed Plaintiff with degenerative arthritis and "Pain, Arthralgia/(PFSS)."[11] [R114].

Dr. Meyers provided the following assessment for the right knee. Plaintiff had a work-related injury that had resulted in four arthroscopic procedures of his right knee. Plaintiff remained symptomatic with post traumatic degenerative joint disease, osteophytes (bony outgrowths), recurrent effusions, and catching and locking symptoms in his right knee. Dr. Meyers believed that Plaintiff was a candidate for a knee replacement, but believed that it should be delayed for as long as possible because of Plaintiff's young age. The surgery could be delayed with a home exercise program to strengthen quadriceps and hamstrings, multiple injections, and pain and anti-

---

[11]     Arthralgia is another name for joint pain.

16

inflammatory medications.  Dr. Meyers concluded that Plaintiff's work restrictions should include limitations in standing, squatting, kneeling, and climbing and that Plaintiff should only be involved in light to moderate work.  [R115].

As for Plaintiff's left knee, Dr. Meyers concluded that there was no evidence of overuse injury because his ligaments were stable and his cartilage surfaces were well maintained.  Dr. Meyers noted that Plaintiff should have an MRI of the left knee to rule out a meniscus tear because of the mild medial joint line tenderness.  [R116].

Plaintiff had knee replacement surgery in August 2007. [R200].[12] On September 5, 2007, Dr. Hui saw Plaintiff for a follow up examination after his total knee arthroplasty.  Plaintiff complained of mild, diffuse knee stiffness.  X-rays revealed excellent alignment and his prosthesis intact.  Dr. Hui made the following impression: "Right total knee arthroplasty, improving."  He recommended that Plaintiff continue with his rehabilitation services and asked Plaintiff to return in four weeks.  Plaintiff was expected to be at maximum medical improvement in three to four months.  [R122].  On this visit, Dr. Hui indicated that Plaintiff could not work until September 26, 2007.  He also referred Plaintiff to rehabilitation services and prescribed Lortab.  [R123].

---

[12]     The administrative transcript does not contain medical records relating to the surgery.

17

On February 11, 2008, Plaintiff was seen for a follow up visit at Gwinnett Consultants in Cardiology.  The note indicated that Plaintiff had a history of nonischemic cardiomyopathy (disease of the heart muscle that decreases the heart's ability to pump blood that is unrelated to coronary artery disease),[13] hypertension, hyperlipidemia, and type 2 diabetes.  Plaintiff was still smoking one or two cigarettes a day.   Plaintiff was assessed with: (1) well controlled hypertension; (2) hyperlipidemia; (3) nonischemic cardiomyopathy, which was stable on Lisinopril (medication to treat high blood pressure); (4) tobacco abuse, for which he was advised to stop smoking; and (5) history of right total knee arthroplasty.  [R118].

A May 7, 2008, report that was signed by Dr. Hui and Allison Swanson, a physician's assistant,[14] showed that Plaintiff was seen following his total knee arthroplasty.  A physical exam showed that Plaintiff had good range of motion, but lacked some quadriceps strength and had fatigue with full straight leg raising.  X-rays

---

[13]    Cleveland Clinic, Diseases & Conditions, Cardiomyopathy, http://my.clevelandclinic.org/heart/disorders/heartfailure/cardiomyopathy.aspx  (last visited 3/11/2011).

[14]    The Commissioner's brief identifies Swanson as a doctor, [Doc. 12 at 9], but the medical note reflects that Plaintiff is a "PA-C," [R117], which the Court construes as an abbreviation for certified physician's assistant.  *See* mediLexicon, http://www.medilexicon.com/medicalabbreviations.php and The Free Dictionary, http://acronyms.thefreedictionary.com/PA-C (last visited Mar. 9, 2011).

AO 72A
(Rev.8/8
2)

of the right knee revealed excellent position and alignment of the prosthesis.  The PA recommended that Plaintiff focus on a quad strengthening program.  He was told to follow up on an as needed basis.  [R117].

Dr. Hui completed a second Pain Questionnaire on July 16, 2008.  First, he found that Plaintiff had moderate pain.  Second, he found that Plaintiff experienced the pain even when there was no weight bearing activity.   Third, Plaintiff was credible concerning his allegations of pain because of his right knee degenerative joint disease. [R164].  Fourth, it was not medically reasonable for Plaintiff to lie down for two hours in the daytime.  Fifth, Plaintiff needed to elevate his leg on a daily basis.  Sixth, Plaintiff was psychologically limited due to his pain.  Finally, Plaintiff could not perform a full 8-hour work day.  [R165].

C.    *Evidentiary Hearing Testimony*

At the November 24, 2008, Plaintiff testified as follows.  He was born on October 22, 1959, and incorrectly believed that he was 50 years old.  [R181-82]. Plaintiff went to high school until the eleventh grade.  He did not try to get a high school diploma or GED.   [R182].  While working for DeKalb County, Plaintiff performed water main repair, water meter repair, and tree removal.  [R186-87].  Prior

to working for the county, Plaintiff worked at a car dealership detailing cars, at a warehouse pulling orders, and a rental car company cleaning cars. [R187-89].

Plaintiff's knee problems prevented him from working. Plaintiff had four surgeries on his knee, the last of which was a knee replacement in August 2007. [R200]. Plaintiff's doctor dismissed him in August 2008 and told him to walk as often as he could. [R189, 191]. Plaintiff walked for 10 minutes or less around his home and then would sit down because of aching. The longest that Plaintiff had walked since his surgery was 12 minutes.[15] [R190]. Plaintiff used a cane, which was prescribed by physical therapy and Dr. Hui. [R203-04].

At Plaintiff's final visit with his doctor in August 2008, Plaintiff's doctor told him to return if he had any problems. Although Plaintiff's knee was hurting, Plaintiff did not return to the doctor because the doctor said it would take two and a half years to heal. [R191]. Plaintiff also performed leg raises that he learned at physical therapy to keep his leg loose. [R194].

During the day, Plaintiff would elevate his knee and try to ice it to prevent it from hurting. [R191]. He also found that a heating pad helped his knee. [R194].

_____

[15]     Plaintiff later testified that he had to walk 15 or 20 minutes so that his knee did not get stiff. [R203].

20

Plaintiff's knee hurt him four hours per day or more, and he often kept an ice pack on it. [R192]. Plaintiff's pain was at a 7 on a 1 to 10 scale.[16] [R200]. Plaintiff was taking Hydrocodone for his knee pain. [R192-93]. He was also taking cholesterol and blood pressure medication. [R193]. Plaintiff's medications made him drowsy and affected Plaintiff's concentration. [R209].

Plaintiff's neighbor kept up with the yard work. Plaintiff did not do any household chores such as cooking, laundry, or putting away groceries. [R195, 196]. Plaintiff would try to go to the store with his wife who would drive to the store where Plaintiff would then use a scooter. Plaintiff answered the phone for his wife and walked to the mailbox to check mail. [R196].

Plaintiff did not believe that he could work anymore. Plaintiff could not stoop or squat because of pain. [R200]. He did not think that he could lift five to ten pounds for two to three hours per day on a regular basis due to knee pain. [R202-03]. As for a sit down job, Plaintiff said he could not sit down very long due to his knee aching. Plaintiff could only sit for 15 minutes "at most" before needing to get up. [R197]. Plaintiff would sit in his recliner for 45 minutes to an hour about 4 times per day.

---

[16]     The knee pain prevented Plaintiff from continuously sleeping, as he had four or five hours of sleep per night. [R205].

21

[R197-98].  In between recliner visits, Plaintiff would sit out and read the newspaper or magazines for two hours.  [R198].  Without elevating his knee in the recliner, Plaintiff's knee would become stiff, and he would not be able to walk on it.  [R201].

The vocational expert ("VE") testified that an individual with the following limitations could work: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) inability to climb ladders, ropes, or scaffolds; (3) ability to occasionally kneel, crouch, crawl, and climb stairs; and (4) sit without limits, but stand for 4 hours though no longer than 30 minutes at a time.  [R213-14].  Such an individual would be able to work as a cashier II or assembler.  [R214].  An individual with the same limitations except that he could only stand for 2 hours total and 10 minutes at a time would also be able to perform the cashier position.  [R214-15].  The VE testified that other sedentary jobs that could accommodate the sit/stand at will option included a bench hand and a surveillance system monitor.  [R215].  As for an individual who needed to elevate his leg beyond three work breaks per day, the VE stated that the workforce would not permit this accommodation.  [R217].  As a result, an individual who needed to elevate his leg at will would also be precluded from all jobs.  Further, the VE testified that an individual who needed to lie down for two hours during the workday also would be precluded from competitive work.  Finally, the VE testified that an

22

individual who had limitations described by Plaintiff at the hearing would be unable to work.  [R218].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through at least the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since January 31, 2006, the amended alleged onset date.

3.   The claimant has medically determinable impairments diagnosed as degenerative joint disease of the right knee status post total knee replacement surgery and hypertension which are found to be severe under the Social Security Act and Regulations.

. . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work activity with lifting/carrying 20 pounds occasionally and 10 pounds frequently; having an unlimited ability to sit; standing 2 hours during an 8 hour workday but doing it no more than 10 minutes at a time; no climbing ladders, ropes or scaffolds; occasional kneeling, crouching, crawling and climbing of stairs; and no working around heights or hazards.

AO 72A
(Rev.8/8
2)

. . .

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

. . .

7.    The claimant is currently forty-nine years of age which is considered a younger individual.

8.    The claimant has a limited (10th grade) education.

9.    The claimant has no transferable skills.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

. . .

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2006, his amended alleged onset date of disability through the date of this decision.

[R15-18].

The ALJ explained these findings as follows.  First, in determining that Plaintiff had a severe impairment of degenerative joint disease, the ALJ summarized the medical evidence from Dr. Hui and Dr. Myers concerning Plaintiff's knee problems.  [R15-16]. Second, in making the RFC determinations, the ALJ rendered the following findings

24

of fact: (1) Plaintiff was only "credible to the extent that he [could] perform" the RFC; and (2) Dr. Hui's opinion was entitled to "little weight." [R17]. The credibility finding and rejection of Dr. Hui opinion appear to be based on: (1) the September 2007 x-ray revealing "excellent alignment" in the right knee; (2) Plaintiff's testimony that he could walk to his mailbox and that he went to the store with his wife; (3) Plaintiff's failure to seek further treatment for the knee after September 2007; (4) Plaintiff's failure to obtain regular treatment, seek a second opinion, or change his medication despite complaining of pain requiring recumbent rest; (5) the absence in the medical reports of any complications that would justify extreme limitations; and (6) the absence in the medical records of complaints of pain or severe limitations alleged at the hearing. [R17]. Third, Plaintiff could not perform his past relevant work given his RFC. [*Id.*]. Finally, Plaintiff could perform other work in the national economy based on the VE's testimony, including cashier, bench hand worker, and surveillance system monitor. [R18].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

25

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met his burden of proving disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments which significantly limits his ability to perform basic

26

work-related activities.  *See* 20 C.F.R. § 404.1520(c).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience.  *See* 20 C.F.R. § 404.1520(d).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work.  *See* 20 C.F.R. § 404.1520(e). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work.  *See* 20 C.F.R. § 404.1520(f).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. § 404.1520(a). Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

27

# V.   SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   The findings of the Commissioner are conclusive if they are supported by substantial evidence and the Commissioner applies the correct legal standards.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d

28

at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff argues that the Commissioner committed the following two errors: (1) improperly weighing the opinion of the treating physician, Dr. Hui; and (2) improperly evaluating Plaintiff's credibility.  [Doc. 11 at 2].  The Court addresses each alleged error below.

### A.   *Treating Physician*

Plaintiff argues that the ALJ erred in examining the opinions of Dr. Hui, a treating physician in two ways: (1) the ALJ failed to apply the six factor test for evaluating opinions in 20 C.F.R. § 404.1527(d); and (2) the ALJ did not provide good cause for rejecting the ALJ's opinion.  [Doc. 11 at 13-20].  The undersigned addresses each argument separately.

29

### 1.    Six-Factor Test

Plaintiff argues that the ALJ erred in evaluating Dr. Hui's opinion because he did not mention or rely on the six-factor test outlined in 20 C.F.R. § 404.1527(d) to determine what non-controlling weight to give to Dr. Hui's opinion. [Doc. 11 at 18-19]. The Commissioner asserts that the reasons outlined by the ALJ and in his brief "were adequate reasons for according little weight to Dr. Hui's opinion." [Doc. 12 at 8]. Plaintiff observes in reply that the Commissioner did not deny that the ALJ failed to use the six-factor test in evaluating Dr. Hui's opinion. [Doc. 13 at 3-4].

The standard applied by the Commissioner in evaluating medical opinions is set forth in 20 C.F.R. § 404.1527. Under this regulation, an ALJ who does not give controlling weight to a treating doctor's opinion must consider the following factors in determining what weight to give the treating doctor's opinion: (1) the length of the treatment relationship; (2) the frequency of the examinations; (3) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in claimant's case record. 20 C.F.R. § 404.1527(d)(2)(i), (d)(2)(ii), (d)(3)-(6); *D'Andrea v. Comm'r of*

30

*Soc. Sec. Admin.*, 389 Fed. Appx. 944, 947 (11th Cir. July 28, 2010).  According to the

Commissioner, "[t]reating source medical opinions are still entitled to deference and

must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927

[even if they are not given controlling weight].  In many cases, a treating source's

medical opinion will be entitled to the greatest weight and should be adopted, even if

it does not meet the test for controlling weight."  Social Security Ruling ("SSR") 96-

2p.[17]

The Court concludes that the ALJ did not consider all factors outlined in

§ 404.1527(d).  Initially, to the extent that Plaintiff argues that it was error for the ALJ

to fail to cite to § 404.1527(d) or explicitly mention the factors from this regulation in

the decision, the Court disagrees because it is unaware of any such requirement.  First,

the regulations do not require the ALJ to explicitly identify these factors.  *See* 20 C.F.R.

§ 404.1527(d) (stating only that the Commissioner "consider[s] all of the following

---

[17]   The Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (citing 20 C.F.R. § 402.35(b)(1)).  These rulings are not binding on the federal courts, *Peeler v. Astrue*, No. 09-15596, 2010 WL 4033988 at *3 n.6 (11th Cir. Oct. 15, 2010), but they are entitled to deference so long as they are consistent with the Social Security Act and regulations.  *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. Apr. 27, 1981); *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007).

AO 72A
(Rev.8/8
2)

factors in deciding the weight [he] gives to any medical opinion"); *see also Amilpas v. Astrue*, No. 09-cv-0389, 2010 WL 2303302, *6 (W.D. Tex. May 17, 2010) (" I cannot conclude that the ALJ made a legal error [] because the regulations do not require the ALJ to explicitly address each 404.1527(d) factor.") (R&R *adopted by* 2010 WL 2756552 (W.D. Tex. July 12, 2010 at *5 & n.38). Second, the Social Security Ruling that interprets § 404.1527(d) does not state that the ALJ is required to explicitly identify these six factors in his opinion, only that the treating source medical opinions "must be weighed using all of the factors provided" by § 404.1527. SSR 96-2p. Third, courts have concluded that an ALJ does not err by failing to expressly address each of the factors outlined in 20 C.F.R. § 404.1527(d). *See Armijo v. Astrue*, 385 Fed. Appx. 789, 795 (10th Cir. June 16, 2010) (citing *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)).

Although it was not error for the ALJ's decision to omit explicit references to the § 404.1527(d) factors, the Court concludes that the ALJ's decision does not indicate that the ALJ considered all of the § 404.1527(d) factors in evaluating Dr. Hui's opinions. "Several federal courts have concluded that an ALJ is required to consider each of the § 404.1527(d) factors when the ALJ intends to reject or give little weight to a treating specialist's opinion." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000)

32

(citing cases); *see also D'Andrea*, 389 Fed. Appx. at 947 ("When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical evidence based on many factors [listed in § 404.1527(d).]"); *Stiltner v. Comm'r of Soc. Sec.*, 244 Fed. Appx. 685, 689 (6th Cir. Aug. 7, 2007) ("[A]n [ALJ] must apply certain factors in determining what weight to give the [treating source] opinion[.]"); *Russ v. Astrue*, No. 3:07-cv-1213, 2009 WL 764516, *9 (M.D. Fla. Mar. 20, 2009) ("The ALJ commits legal error when he fails to consider and discuss the § 404.1527(d) factors before discrediting a treating physician's opinion.").

There are two opinions from Dr. Hui in the record, one from August 2006, [R166-67], and the other from July 2008, [164-65]. The ALJ's decision indicates that the ALJ did not evaluate both opinions using all of the § 404.1527(d) factors. First, although the ALJ's decision cited to Dr. Hui's treatment notes between 2003 and 2008, [*see* R15-16], the decision does not indicate that the ALJ then considered the length of the treatment relationship in weighing Dr. Hui's opinions, [*see* R17]. *See* 20 C.F.R. § 404.1527(d)(2)(i).

Second, although the summary of Dr. Hui's treatment indicated that the ALJ was aware of the frequency of Dr. Hui's evaluations, the ALJ did not fully evaluate this factor because the ALJ only noted that Plaintiff had not sought further treatment for his

33

knee after September 2007, [R15-16, 17], which is only relevant to Dr. Hui's July 2008 opinion.  As such, it is not clear that the ALJ evaluated the frequency of Dr. Hui's treatment in according the August 2006 opinion little weight.

Third, the Court recognizes that ALJ's summary of Dr. Hui's treatment shows that he was aware of the nature and extent of the treatment relationship with Plaintiff, *see* 20 C.F.R. § 404.1527(d)(2)(ii), but the ALJ's discussion in weighing Dr. Hui's opinions does not demonstrate that the ALJ applied this factor.  [*See* R17].  Fourth, the ALJ did not consider the supportability of Dr. Hui's opinions because the decision did not examine whether Dr. Hui supported his opinions with relevant evidence.  [*See* R17]. *See* 20 C.F.R. § 404.1527(d)(3).[18]  Fifth, the ALJ did not consider the specialty of Dr. Hui because he did not mention how Dr. Hui's orthopedic specialty affected the weight given to Dr. Hui's opinions.  [*See* R17].  *See* 20 C.F.R. § 404.1527(d)(5).

Although the ALJ's evaluation of Dr. Hui's opinions does not indicate that he considered the above § 404.1527(d) factors, the Court notes that the ALJ did consider other § 404.1527(d) factors in evaluating Dr. Hui's opinions.  First, the ALJ's

_____

[18]     The Court notes that had the ALJ examined whether Dr. Hui had presented "relevant evidence to support" his opinions, 20 C.F.R. § 404.1527(d)(3), the ALJ most likely would have determined that the opinions were conclusory and therefore that Dr. Hui did not present any evidence to support his opinions.  However, the ALJ did not evaluate this factor, and the Court will not make this finding of fact for the ALJ.

AO 72A
(Rev.8/8
2)

statements about X-rays showing excellent alignment, the absence in the record of pain complaints, the absence of evidence of complications, and Plaintiff's activities of shopping and walking to the mailbox indicate that the ALJ considered the consistency of the opinion "with the record as a whole." *Id.* § 404.1527(d)(4).[19] Second, the ALJ's reference to Plaintiff's daily activities may also be evidence that he considered "other factors" in evaluating Dr. Hui's opinions pursuant to § 404.1527(d)(6). *See Holmes v. Astrue*, No. 1:09-cv-1523-AJB, 2010 WL 2196600, *17 & n.19 (N.D. Ga. May 27, 2010) ("Federal courts have indicated . . . that a claimant's daily living activities . . . may constitute the sort of 'other evidence' that can be used to give less weight to a medical opinion.").

While the ALJ may have considered two factors in evaluating Dr. Hui's opinions, the undersigned concludes that the ALJ did not consider every § 404.1527(d) factor in evaluating Dr. Hui's opinions. The undersigned recognizes that "not all factors 'will apply in every case.'" *Armijo*, 385 Fed. Appx. at 795 (quoting *Oldham*, 509 F.3d at 1258). However, the ALJ's decision did not adequately address the relevant factors in determining what weight to give Dr. Hui's opinions and did not identify how the factors

---

[19]     Although the Court finds that the ALJ considered the factor listed in § 404.1527(d)(4), the Court concludes that the reasons listed by the ALJ do not provide substantial evidence to support the ALJ's finding as discussed below.

applied to each of Dr. Hui's opinions.  Accordingly, the Court concludes that the ALJ erred in evaluating Dr. Hui's opinions pursuant to § 404.1527(d).

2.     *Good Cause*

Plaintiff argues that the ALJ did not articulate good cause for rejecting Dr. Hui's opinions.  [Doc. 11 at 15-18].  Plaintiff initially notes that the ALJ's reliance on his ability to go to the mailbox and go to the store with his wife did not contradict Dr. Hui's opinions because neither activity showed that he could work 8 hours per day. [*Id.* at 16].  He also asserts that the ALJ's reliance on his failure to seek further treatment or a change in medication is unenlightening because Dr. Hui's treatment of Plaintiff suggested that he did not need any different treatment or other medications. [*Id.* at 17].  He further argues that the ALJ's reliance on the lack of complaints of pain or other severe limitations found by Dr. Hui is unpersuasive because the medical record documented pain and other limitations.  [*Id.* at 17-18].

The Commissioner responds that substantial evidence supports Dr. Hui's opinion.  First, the Commissioner notes that the treatment records do not support Dr. Hui's opinion given that Plaintiff had normal ROM, experienced only mild tenderness, had negative X-rays of the left knee, and reported intermittent pain before the 2006 opinion.  [Doc. 12 at 8].  Second, the Commissioner argues that Dr. Hui's opinion was

36

inconsistent with Dr. Meyer's opinion.  [*Id.*].  Third, the Commissioner contends that the ALJ properly observed that Plaintiff did not seek additional treatment for long after his total knee replacement and that the treatment he received showed that Plaintiff was doing well.  [*Id.*].  Fourth, the Commissioner observes that the May 7, 2008, medical note found Plaintiff's prosthesis to be intact and Plaintiff to have excellent ROM in his knees.  [*Id.*].

Plaintiff replies that the Commissioner's response misstates the record and engages in impermissible *post hoc* rationalizing.  [Doc. 13 at 1].  First, Plaintiff's notes that the Commissioner's summary of the record does not show any medical basis for concluding that the X-rays were inconsistent with Dr. Hui's opinion.  [*Id.* at 1-2].  Second, Plaintiff asserts that there is no evidence that other treatment would assist Plaintiff, so the lack of additional treatment did not disprove Dr. Hui's opinion.  [*Id.* at 2].  Third, Plaintiff asserts that Dr. Hui's discharge does not weaken his opinion and there is no basis to make this statement.  [*Id.*].  Fourth, Plaintiff notes that the Commissioner did not respond to his arguments that certain evidence supported

Dr. Hui's opinions, and argues that this failure to respond is evidence that the Commissioner conceded that the rejection of Dr. Hui's opinion was error.[20] [*Id.* at 3].

A treating physician's opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Comm'r of Social Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis*, 125 F.3d at 1440); *see also* 20 C.F.R. § 404.1527(d)(2). "Good cause" exists for rejecting a treating doctor's opinion when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). The ALJ must clearly articulate the reasons for giving less weight to the treating physician's opinion, *Lewis*, 125 F.3d at 1440, by "always giv[ing] good reasons in the notice of the . . . decision for the weight given to a treating source's medical opinion(s)." SSR 96-2p. Thus, when the decision is not fully favorable to a claimant, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

---

[20]   The Commissioner's defense of the ALJ's decision shows that the Commissioner did not concede any error in the ALJ's treatment of Dr. Hui's opinions.

AO 72A
(Rev.8/8
2)

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If the ALJ ignores a treating physician's opinion or makes no finding as to its weight, the opinion is deemed true as a matter of law. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Harris v. Astrue*, 546 F. Supp. 2d 1267, 1282 (N.D. Fla. 2008).

The Court concludes that substantial evidence does not support the ALJ's reasons for failing to give Dr. Hui's opinions "considerable weight." The ALJ's reasons for not giving Dr. Hui's opinions considerable weight appear to be as follows:[21]

[(1)] I note that in September 2007 Dr. Hui noted that x-rays of the claimant's right knee revealed excellent alignment with the prosthesis intact.

[(2)] I also note that the claimant testified that he walked to his mailbox and that he went to the store with his wife on occasion.

[(3)] The claimant has not sought further treatment for his knee since September 2007 although he went back in 2008 to get the Pain Questionnaire completed.

[(4)] [H]e has not continued with regular treatment, sought second opinions, or a change in medication.

---

[21]     The Court notes that reasons four through six might relate to the ALJ's credibility determination, but because it is not clear, the Court will consider these reasons as applying to the ALJ's rejection to Dr. Hui's opinions.

39

[(5)]  His medical reports do not show any complications such as infections or swelling that would justify such extreme limitations.

[(6)]  The medical records do not contain any complaints of pain, severe limitations . . . or contain restrictions such as that prepared for this Social Security claim.

[R17].

Before explaining why these reasons do not provide substantial evidence to support the ALJ's weight to Dr. Hui's opinions, the Court first turns to the arguments in the Commissioner's brief, which Plaintiff labels as *post hoc* rationalizations.  "The Supreme Court has held that a court may not accept appellate counsel's post hoc rationalizations for agency actions. . . .  If an action is to be upheld, it must be upheld on the same bases articulated in the agency's order."  *Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) (citing *FPC v. Texaco Inc.*, 417 U.S. 380, 397 (1974)).  The Court agrees that the following arguments advanced by the Commissioner encompass impermissible *post hoc* reasoning because they were not advanced by the ALJ in weighing Dr. Hui's opinions: (1) Plaintiff had normal ROM, experienced only mild tenderness, had negative X-rays of the left knee, and reported intermittent pain before the 2006 opinion; (2) Dr. Hui's opinion was inconsistent with Dr. Meyer's opinion; and (3) the May 7, 2008, medical note found Plaintiff to be intact

with excellent ROM in his knees. [*See* Doc. 12 at 8-10]. None of these reasons were mentioned, suggested, or implied as reasons for giving little weight to the ALJ's decision.[22] Additionally, any reliance on the May 2008 medical note is clearly a post-hoc reason because the ALJ was not even aware of the note. [*See* R17 (noting that Plaintiff had not sought further treatment after September 2007)]. As a result, the Court discounts these arguments by the Commissioner and turns to whether the reasons advanced by the ALJ provide substantial evidence to give little weight to Dr. Hui's opinions.

The Court finds that the ALJ's reasons do not provide substantial evidence. First, the Court agrees with Plaintiff's argument that the ALJ's observation about Plaintiff's X-ray revealing excellent alignment does not contradict or undermine Dr. Hui's opinions because there is no medical evidence (other than from Dr. Hui) suggesting what the medical significance of this alignment means. Stated differently, the only medical opinion about the medical significance of an excellent alignment and

---

[22]   At oral arguments, the Commissioner creatively argued that even if Dr. Hui's opinions were given great weight, Plaintiff could not satisfy the durational requirement. For instance, the Commissioner noted that both before and after the August 2006 opinion, evidence indicated that Plaintiff could return to work. The Court recognizes that evidence seems to support the Commissioner's argument [*see* R115, 123, 125-26], but this reason was not given by the ALJ. As a result, the Court will not consider it because it is a post-hoc rationalization.

41

AO 72A
(Rev.8/8
2)

an intact prosthesis came from Dr. Hui who was of the opinion that despite this excellent alignment Plaintiff: (1) experienced moderate pain; (2) experienced pain when there was no weight bearing activity; (3) was credible concerning his allegations of pain; (4) needed to elevate his leg on a daily basis; (5) was psychologically limited due to his pain; and (6) could not perform a full 8-hour work day.  [R164-65]. Therefore, the Court concludes that the evidence of "excellent alignment" and an intact prosthesis does not undermine Dr. Hui's July 2008 opinion because Dr. Hui is the only medical source to assign any medical significance to this alignment and intact prosthesis.[23]

Second, the ALJ's reliance on the Plaintiff's ability to walk to the mailbox and go to the store does not provide a valid basis to reject Dr. Hui's opinions.  The Court recognizes as a general matter that a plaintiff's daily activities may undermine a doctor's medical opinion.  *See O'Bier v. Comm'r of Soc. Sec. Admin.*, 338 Fed. Appx. 796, 798 (11th Cir. July 2, 2009) (citing *Phillips*, 357 F.3d at 1241, for the proposition that "[a]n ALJ does not need to give a treating physician's opinion considerable weight, however, if the claimant's own testimony regarding her daily activities contradicts that

---

[23]   Also, this observation about Plaintiff's alignment does not suggest why it undermines the August 2006 opinion from Dr. Hui because alignment became an issue only after the August 2007 knee replacement.

AO 72A
(Rev.8/8
2)

opinion."). However, in this case, these daily activities do not contradict Dr. Hui's opinions because Plaintiff's testimony about the mailbox indicates that this was the only chore that he performed at home to assist his wife. [R196]. It is not clear how this limited activity undermines in any way Dr. Hui's opinions. Also, Plaintiff's shopping activities do not undermine Dr. Hui's opinions because Plaintiff testified that his wife drove to the store, Plaintiff rode in a scooter at the store, and his wife put away groceries after the store. [*See* R196]. Given the limited nature of these daily activities, the Court concludes that they are not substantial evidence to support the ALJ's decision to give Dr. Hui's opinions little weight because they do not contradict Dr. Hui's opinions.

Third, the ALJ's statement that Plaintiff did not seek further treatment after September 2007 is error because a May 2008 medical record exists from Dr. Hui's office, [R117], and Plaintiff testified that he went to Dr. Hui in August 2008, [R190-91]. Aside from the erroneous statement, the ALJ's statement ignores that Dr. Hui provided an opinion in August 2006 when Plaintiff was receiving regular treatment for his knee. [*See, e.g.*, R131 (going to Dr. Hui for treatment on 5/16/2005), R129 (seeking treatment on 7/25/2005), R128 (seeking treatment on 9/23/2005), R127 (seeking treatment on 11/4/2005), R126 (getting treatment on 1/6/2006), R125 (seeking

43

treatment on 2/10/2006), R124 (obtaining treatment on 5/8/2006), R168-69, 173 (getting injections in the summer of 2006)].  Therefore, even if Plaintiff had not had treatment after September 2007, this does not undermine Dr. Hui's opinion from August 2006.  As such, the Court concludes that it is not substantial evidence to support the ALJ's conclusion to give "little weight" to both of Dr. Hui's opinions.

Fourth, the ALJ's statement about Plaintiff not receiving continued regular treatment or changing medications may be a valid basis for rejecting Dr. Hui's July 2008 opinion because the evidence indicates that Plaintiff was seen twice (in May and August 2008) at Dr. Hui's office.  [R117, 190-91].  However, as suggested in the prior paragraph, this reason does not provide substantial evidence to support rejecting Dr. Hui's August 2006 opinion because the record demonstrates that Plaintiff was receiving regular treatment prior to Dr. Hui's August 2006 opinion.  As a result, Plaintiff's failure to receive regular treatment, seek a second opinion, or change medications does not provide substantial evidence to support the ALJ's decision to give little weight to both of Dr. Hui's opinions.

Fifth, the Court concludes that the ALJ's finding that the lack of complications such as swelling contradicted Dr. Hui's extreme limitations does not provide substantial evidence to support the ALJ's decision.  It is true that there is no evidence of swelling

44

or any complications following Plaintiff's knee replacement when Dr. Hui provided his July 2008 opinion. [*See* R117, 123]. However, prior to Dr. Hui's August 2006 opinion, Plaintiff was complaining of pain, [R124-26], he had fluid in his knee, [R93, 125-27], and he received injections during the summer of 2006, [R168-69, 173]. He also received a knee replacement in August 2007 despite both Dr. Hui and Dr. Meyer wanting to delay the operation if possible because of Plaintiff's age. [R115, 125]. Therefore, that Dr. Hui performed a procedure that he wanted to delay suggests that even without complications, Plaintiff's knee was causing problems. Also, Dr. Hui is the only medical source to have provided an opinion about Plaintiff's limitations after 2006. As such, Dr. Hui, the only doctor to examine Plaintiff after 2006, determined that Plaintiff's condition warranted the following "extreme limitations": Plaintiff needed to elevate his foot, had pain from non-weight bearing activity, and suffered moderate pain, which limited him psychologically. The Court therefore concludes that Plaintiff's lack of complications does not provide substantial evidence to give both of Dr. Hui's opinions little weight.

Finally, the Court concludes that the ALJ's assertion that the medical records do not contain any complaints of pain or severe limitations is not substantial evidence in support of his opinion. Following the knee replacement, the Court recognizes that the

45

two medical records do not reference knee pain by Plaintiff, which may provide evidence to support rejecting the 2008 opinion.  [R117, 123].  However, the ALJ's reason is insufficient to give little weight to the 2006 opinion because the finding about a lack of pain is simply incorrect.  The medical notes indicate that Plaintiff complained about knee pain in the months of 2005 and 2006 leading up to Dr. Hui's opinion. [R124-29, 168].  As for severe limitations, Plaintiff apparently had sufficient problems that he needed  injections in his knees to reduce pain, [R168-69, 173], and ultimately a knee replacement surgery at an age that the doctors were reluctant to perform such a procedure.  The Court therefore concludes that ALJ's statement that Plaintiff did not complain about pain or limitations is not a reason for rejecting both of Dr. Hui's opinions.

Accordingly, for the reasons above, the Court concludes that the reasons advanced by the ALJ do not provide substantial evidence to support the ALJ's decision to give Dr. Hui's opinions "little weight."  As a result, the Commissioner **ERRED** in evaluating Dr. Hui's opinion.

Given this conclusion, the Court turns to the appropriate remedy.  Plaintiff asserts that Dr. Hui's opinions should be accepted as true when evaluated on remand. [Doc. 13 at 7].  As stated above, the treating physician's opinion is deemed true as a

46

matter of law if the ALJ ignores it or fails to make a finding as to its weight.  *See, e.g.*, *MacGregor*, 786 F.2d at 1053[24]; *Harris*, 546 F. Supp. 2d at 1282.  However, a court need not deem a treating doctor's opinion as true where "it is appropriate that the evidence be evaluated in the first instance by the ALJ pursuant to the correct legal standards." *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).  Here, the ALJ did not ignore Dr. Hui's opinions or fail to make findings as to their weight.  Instead, as discussed above, his findings were not supported by substantial evidence.  As a result, the Court concludes that the Commissioner need not treat these opinions as true

---

[24]     The Court recognizes that the *MacGregor* court held as a matter of law that a treating source's opinion is accepted as true where the Commissioner "has ignored or failed properly to refute a treating physician's testimony."  *MacGregor*, 786 F.2d at 1053.  This language arguably suggests that any error in evaluating a treating doctor's opinion will be treated as true.  However, the Court does not read *MacGregor* so broadly.  First, as recognized in *Harris v. Astrue*, the *MacGregor* case involved the "Secretary" ignoring a treating doctor's opinion.  *Harris*, 546 F. Supp. 2d at 1282 (citing *MacGregor*, 786 F.2d at 1053).  Second, Eleventh Circuit opinions preceding *MacGregor* have remanded for the Commissioner to reconsider treating doctors opinions that were improperly considered.  *See Broughton*, 776 F.2d at 962; *see also Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir. 1982) (remanding for the ALJ to evaluate the weight given to treating doctor where the ALJ's opinion failed "to mention the . . . treating physician and the weight, if any, the ALJ gave to the treating physician's evidence and opinion" and the court was unable "to determine whether the ALJ applied the proper legal standard" for weighing the doctor's opinions).  As a result, the Court does not find that it must treat Dr. Hui's opinions as true.

AO 72A
(Rev.8/8
2)

on remand. Instead, the Commissioner on remand should reevaluate Dr. Hui's opinions using the correct legal standards.

Accordingly, the case is **REMANDED** for the ALJ to reconsider Dr. Hui's opinions using the proper legal standards.

### B.      Credibility[25]

Plaintiff asserts that the ALJ committed two errors in evaluating Plaintiff's credibility. [Doc. 11 at 20-22]. First, Plaintiff contends that the ALJ did not articulate the credibility standard that he was using or otherwise apply the Eleventh Circuit's pain standard because the ALJ merely stated that he found Plaintiff to be credible only to the extent that he could perform the RFC. [*Id.* at 20-21]. Second, Plaintiff argues that substantial evidence does not support the ALJ's credibility finding because the reasons recited by the ALJ do not undercut Plaintiff's statements about his limitations. [*Id.* at 21-22].

---

[25]      At the oral argument hearing, Plaintiff did not address his arguments about the ALJ's credibility findings. In this Court's Scheduling Order, the Court stated that "[a]ny issue raised in the briefs but not argued at oral hearing . . . will be deemed abandoned." [Doc. 10 at 3]. Therefore, the Court could deem Plaintiff's credibility arguments abandoned. However, the Court will waive this rule in this case because the case needs to be remanded to the Commissioner on other grounds and the ALJ erred in evaluating Plaintiff's pain. Therefore, the Commissioner should correct the error on remand.

AO 72A
(Rev.8/8
2)

Citing to pages 16-17 of the administrative transcript, the Commissioner responds that the ALJ found that Plaintiff's impairments "could reasonably be expected to produce his alleged symptoms." [Doc. 12 at 12]. The Commissioner argues that substantial evidence supports the ALJ's credibility determination that Plaintiff was credible only to the extent that he could not perform more than light work. [*Id.* at 12]. First, the Commissioner notes that the ALJ pointed to Dr. Hui's treatment notes and his statement that Plaintiff was only limited to squatting and heavy lifting. [*Id.* at 13]. Second, the Commissioner asserts that Dr. Meyer concluded that Plaintiff could perform light to moderate work and only recommended conservative treatment. [*Id.* at 13-14]. Third, the Commissioner asserts that treatment notes following Plaintiff's surgery did not reveal serious limitations. [*Id.* at 14]. Finally, the Commissioner asserts that the April 2006 state agency assessment supports the ALJ's credibility finding. [*Id.* at 15].

Plaintiff replies by arguing that the Commissioner erroneously argued that the ALJ applied the proper standard. [Doc. 13 at 4-5]. Plaintiff then argues that the ALJ's "credible to the extent" conclusion was no credibility "finding at all" because it was conclusory and therefore prevents this Court from reviewing the finding. [*Id.* at 5]. As for the Commissioner's substantial evidence argument, Plaintiff asserts that the ALJ

AO 72A
(Rev.8/8
2)

made no legitimate credibility finding. [*Id.* at 5]. Plaintiff emphasizes that no credibility finding was made because the Commissioner's brief does not equate to any such finding. [*Id.* at 6]. Finally, Plaintiff asserts that the Commissioner's entire credibility argument constitutes *post hoc* reasoning since the ALJ made no such findings. [*Id.* at 6-7].

In evaluating whether a Plaintiff is disabled based on a claimant's testimony regarding her pain or other subjective symptoms, the Eleventh Circuit requires the Commissioner to consider whether there is: " '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.' " *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *see also* 20 C.F.R. § 404.1529.[26] The ALJ need not cite to the pain standard so long as "his findings and discussion indicate that the standard was applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002); *Crispin v. Astrue*, No. 5:09-cv-219, 2010 WL 3833670, *11 (M.D. Fla.

---

[26]    Section 404.1529 "contains the same language regarding the subjective pain testimony" as the Eleventh Circuit's pain standard. *Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002).

AO 72A
(Rev.8/8
2)

Sept. 28, 2010) ("While the ALJ did not expressly state that he was applying the pain standard, a review of his decision discloses that the ALJ followed the proper framework in evaluating the credibility of Plaintiff's subjective complaints[.]"); *Brandon v. Astrue*, No. 1:09-cv-1004-AJB, 2010 WL 3781981, *13 (concluding that ALJ's discussion indicated that he "implicitly considered and applied the pain standard").

The pain standard "is designed to be a threshold determination made prior to considering the plaintiff's credibility." *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1189 n.1 (N.D. Ala. 2006). Thus, "[i]f the pain standard is satisfied, the ALJ must consider the plaintiff's subjective complaints." *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372 (S.D. Ala. 2003). When a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, she may be found disabled. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ determines, however, that claimant's testimony is not credible, "the ALJ must show that the claimant's complaints are inconsistent with his testimony and the medical record." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1368 (N.D. Ga. 2006).

The ALJ has discretion in making credibility determinations after listening to a claimant's testimony, "[b]ut the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate

51

reasons for rejecting that testimony." *Holt*, 921 F.2d at 1223. As a result, the credibility determination cannot be "a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.' " *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at 1561). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562. If the ALJ fails to explain the reasons that he discredited a claimant's testimony, the testimony must be accepted as true. *Id.* at 1223-24.

The Court concludes that the ALJ erred by both failing to apply the pain standard and in evaluating Plaintiff's credibility. As for the pain standard, the ALJ's decision does not specifically cite to or allude to the Eleventh Circuit's pain standard or the standard for evaluating pain listed in 20 C.F.R. § 404.1529. As outlined above, this omission is not fatal to the ALJ's decision. *Wilson*, 284 F.3d at 1225-26.

However, the language of the decision indicates that the ALJ not only failed to cite to the pain standard, but also failed to apply the standard. The Court recognizes that the ALJ found that Plaintiff had DJD status post total knee replacement surgery based on the medical evidence. [R15-16]. This conclusion suggests that the ALJ made a finding as to the first prong of the pain standard, *i.e.*, there is evidence of an

52

underlying medical condition.  However, the decision fails to demonstrate that the ALJ made a finding as to the second prong by finding either that "objective medical evidence [] confirms the severity of the alleged pain arising from that condition or . . . that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  *Dyer*, 395 F.3d at 1210.  There is no language in the decision indicating that the ALJ made either finding.  The Commissioner's brief cites to pages 16-17 of the transcript as showing that the ALJ applied the pain standard, [Doc. 12 at 12], but the Court agrees with Plaintiff that nowhere on these pages is the pain standard applied.  [*See* Doc. 13 at 4-5].  Instead, the ALJ's decision is simply silent as to this prong of the pain standard.  This is error.  *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (reversing where the ALJ decision did not indicate that pain standard was applied to claimant's testimony because ALJ did not, *inter alia*, consider whether the underlying medical condition could reasonably be expected to give rise to the alleged pain).

The Court recognizes that the ALJ made the following statement about credibility: "The undersigned has only found the claimant to be credible to the extent that he can perform this work activity."  [R17].  Since the pain standard "is a gateway

53

which allows the ALJ to consider whether a claimant's pain is disabling,"[27] the Court assumes without deciding that the ALJ's omission of any discussion of the pain standard from his opinion could be harmless error where the ALJ reached the issue of Plaintiff's credibility.  The Court cannot find harmless error in this case because, for the reasons below, the ALJ erred in evaluating Plaintiff's credibility.

The ALJ's credibility finding is unclear as it appears to be mixed with the ALJ's finding for giving Dr. Hui's opinions "little weight."  [*See* R17].  Plaintiff in his opening brief recognized this dual finding.  [Doc. 11 at 21-22 ("The ALJ did not discuss [Plaintiff's] credibility separately from Dr. Hui's opinion.  Apparently the ALJ intended the same reasons to support his rejection of both[.]")].  However, in the reply brief, Plaintiff changes his mind and asserts that the ALJ made no finding that can be considered a credibility finding.  [Doc. 13 at 5].  The Court agrees with Plaintiff's opening brief and finds that the ALJ's credibility determination is based on the following factors:[28] (1) x-rays revealing excellent alignment; (2) Plaintiff's testimony

---

[27]     *Olds v. Astrue*, No. 2:07-cv-1017, 2008 WL 5251779, *4 (M.D. Ala. Dec. 17, 2008); *see also Reliford*, 444 F. Supp. 2d at 1189 n. 1 (describing pain standard as threshold finding before considering credibility).

[28]     Although the Court concludes that the ALJ's finding concerning the weight given to Dr. Hui's opinions also encompassed a finding as to Plaintiff's credibility, the Court does not condone such a method of analysis because it is

54

about shopping and walking to the mailbox; (3) Plaintiff's failure to seek treatment after September 2007; (4) Plaintiff's failure to continue with regular treatment, seek second opinions, or obtain changes in medication despite his complaints of disabling pain requiring recumbent rest and icing; (5) Plaintiff's medical reports omitting any complications to justify such extreme limitations; and (6) Plaintiff's medical records omitting any complaints of pain or severe limitations. [R17]. Some of these statements are erroneous.

First, the only evidence in the record about alignment is from Dr. Hui who apparently believed that alignment does not preclude the pain described by Plaintiff. Second, Plaintiff's ability to walk to the mailbox and go to the store does not undermine Plaintiff's credibility. Plaintiff testified that he could walk for 10 minutes around his home, [R190], which is consistent with his testimony about walking to the mailbox. Also, Plaintiff testified that he did not drive to the store or walk at the store, [R196], which is also consistent with his testimony. As a result, the daily activities cited by the ALJ do not undermine Plaintiff's credibility. Third, the ALJ wrongly determined that Plaintiff had not sought further treatment after September 2007 because the record

_____

confusing. For instance, the Court (and the claimant reading the decision) cannot easily determine where the weighing of Dr. Hui's opinions ends and the evaluation of Plaintiff's credibility begins. These two findings should be discussed separately.

55

shows that he went to Dr. Hui's office in May and August 2008. [*See* R117, 190-91].

Fourth, although the post-knee replacement medical notes omit references to pain, [R117 (noting fatigue and full ROM); R123 (referencing stiffness)], the medical record demonstrates that Plaintiff was treated for pain, [*see, e.g.*, R93, 127-29, 131, 124-26], so it was incorrect for the ALJ to state that the medical records do not include references to pain. Given these errors in the ALJ's credibility determination,[29] the Court concludes substantial evidence does not support the ALJ's credibility finding. As a result, the Commissioner **ERRED** in evaluating Plaintiff's credibility.

Given this conclusion, the Court turns to the appropriate remedy. Plaintiff states that the ALJ's error requires that Plaintiff's subjective complaints be treated as true on remand. [Doc. 13 at 7]. The Court disagrees. Under the Eleventh Circuit law, the "[f]ailure to articulate the reasons for discrediting subjective testimony requires, as a

---

[29]    The Court notes that certain findings by the ALJ are supported. For instance, the ALJ properly noted that Plaintiff did not seek regular treatment, second opinions, or a change in his medications despite his continuing problems with his knee. Also, the Court observes that other reasons provided by the ALJ for discrediting Plaintiff may be supported by the record depending on how the Commissioner weighs Dr. Hui's opinions on remand. First, if Dr. Hui's opinions continue to be given little weight on remand, the medical records will not support Plaintiff's testimony of his extreme limitations involving elevating his leg. Second, with Dr. Hui's opinions discredited, the medical record will not contain any other evidence of the severe limitations that Plaintiff alleged at the hearing.

56

matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225 (citing *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988)).  Also, where the ALJ articulates reasons for refusing to credit the claimant's pain testimony, "but none of these reasons is supported by substantial evidence . . . that claimant's pain testimony [is] accepted as true." *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987); *Dunn v. Astrue*, 660 F. Supp. 2d 1290, 1294 (N.D. Ala. 2009).  Here, although the Court concludes that the ALJ erred in evaluating Plaintiff's credibility, this conclusion is not based on a finding that the ALJ failed to articulate the reasons for discrediting Plaintiff's subjective complaints or that every reason proffered by the ALJ was not supported by substantial evidence.  Instead, the Court has determined that the ALJ articulated reasons some of which were incorrect.  As a result, the Commissioner need not accept Plaintiff's testimony about his subjective complaints as true on remand because the ALJ made an explicit credibility determination that was at least based in part on valid reasoning.  *See Mitchell v. Comm'r of Soc. Sec.*, No. 6:09-cv-1788, 2011 WL 161046, *12 n.7 (M.D. Fla. Jan. 18, 2011) (Jan. 18, 2011) (distinguishing *Holt* on the grounds that the ALJ in the *Mitchell* case made an explicit credibility determination); *cf. Foote*, 67 F.3d at 1562 (remanding case where the ALJ failed to make a credibility determination); *Smallwood v. Schweiker*, 681 F.2d 1349, 1352

57

(11th Cir. 1982) (remanding where determination on the credibility was critical to determine whether the administrative decision was supported by substantial evidence); *Calzadilla v. Astrue*, No. 10-20784-CIV, 2010 WL 4942980, *7 (S.D. Fla. Nov.30, 2010) (remanding for Commissioner to perform a proper credibility analysis); *Williams v. Astrue*, No. 08-23099-CIV, 2010 WL 1010868, *6 (S.D. Fla. Mar. 15, 2010) ("Remand is required so that a new hearing can be conducted and a new analysis of the Plaintiff's credibility can be made.").[30]

Accordingly, the Court **REMANDS** this case to the Commissioner to apply the pain standard and make a proper credibility determination.

---

[30]    Alternatively, even if this conclusion is wrong, the Court notes that this case needs to be remanded for the Commissioner to reconsider the treating doctor's opinions.  In light of this determination, the Commissioner should reevaluate Plaintiff's credibility. *Austin v. Astrue*, No. 5:07-cv-52, 2008 WL 2385520, *14 (N.D. Fla. June 9, 2008) ("[I]n light of this court's [decision] to remand, it is further recommended that upon remand the ALJ reevaluate Plaintiff's credibility."); *cf. Volley v. Astrue*, No. 1:07-cv-138, 2008 WL 822192, *21 (N.D. Ga. Mar. 24, 2008) ("Because the undersigned has determined that this case should be remanded for further consideration [based on other errors], the Court does not make an ultimate determination on the ALJ's credibility determination[, but . . . t]he Commissioner should articulate reasons, if any exist, for rejecting Plaintiff's allegations[.]").

58

**VII.   CONCLUSION**

For the aforementioned reasons, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 25th day of March, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

59